UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

GENERAL MOTORS ACCEPTANCE CORPORATION,

                              Plaintiff,

                                                            DECISION AND ORDER

                                                            07-CV-6037L

              v.

FAITH ANN PEASLEE, et al.,

                              Defendants
_____


HSBC AUTO FINANCE
formerly known as Household Automotive
Finance Corporation,

                              Plaintiff,

              v.                                            07-CV-6072L

PAMELA D. JACKSON,
formerly known as Pamela D. Harris,

                              Defendant.
_____

GMAC, LLC,

                              Plaintiff,

              v.                                            07-CV-6121L

FAITH ANN PEASLEE, et al.,

                              Defendants.
_____

---

SOVEREIGN BANK,

                              Plaintiff,

            v.                                        07-CV-6168L

MICHAEL COLOMBAI, et al.,

                              Defendants.

---

AMERICAN SUZUKI FINANCIAL SERVICES
COMPANY, LLC,

                              Plaintiff,

            v.                                        07-CV-6202L

OMAYRA MARTINEZ
George M. Reiber, Trustee, et al.,

                              Defendants.

---

## INTRODUCTION

These cases, which have been consolidated for argument and decision, are before the

Court on appeal from decisions of Bankruptcy Judge John C. Ninfo, II, entered on various dates

in each of the individual cases on appeal.[1]  Because the controlling issues in each case are the

---

[1]Although there are five separate appeals before me, two of those appeals are taken from
the same case, *In re Peaslee*, Bankr. No. 06-21200.  The first appeal in *Peaslee* is from Judge
Ninfo's December 22, 2006 Decision and Order concerning the amount of the creditor's allowed
secured claim.  The second appeal is from Judge Ninfo's January 11, 2007 Order confirming the
                                                                    (continued...)

same, appellants, at this Court's direction, have filed a joint brief concerning those issues, as well as individual supplemental briefs in two of the cases addressing issues peculiar to those cases. The Court heard oral argument on these appeals on July 10, 2007.

These cases join a rapidly-growing body of case law that has been generated by a 2005 amendment to § 1325 of the Bankruptcy Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). The specific question presented by these appeals involves the extent to which a creditor holds a purchase money security interest (sometimes "PMSI") in connection with a motor vehicle sale in which the seller allows the buyer to "roll in" the "negative equity" on a trade-in vehicle, *i.e.*, the difference between the vehicle's outstanding loan balance and its market value, as part of the purchase price of the new vehicle. Although the cases addressing this question are numerous and quickly growing in number, no clear consensus on that issue has yet emerged. *See In re Trejos*, 352 B.R. 249, 253 and n. 6 (Bankr. D.Nev. 2006) (stating that "[j]ust what this effect [of the amendment to § 1325] is turns out to be a thorny question of statutory interpretation, upon which many, many bankruptcy judges have already given their views," and commenting on "[t]he number and diversity of these opinions") (collecting cases).

Each of the cases before me involves the treatment of a particular creditor's claim that was secured by a motor vehicle purchased by the Chapter 13 debtor within 910 days (about two

---

[1](...continued)
debtor's Chapter 13 Plan.

The other decisions by Judge Ninfo that are the subject of these appeals are *In re Jackson*, 358 B.R. 560 (Bankr. W.D.N.Y. 2007); *In re Martinez*, 362 B.R. 600 (Bankr. W.D.N.Y. 2007); and *In re Colombai*, 362 B.R. 605 (Bankr. W.D.N.Y. 2007).

and a half years) prior to the filing of the bankruptcy petition.  In each case, the debtor's plan provided that the claim in question was to be treated as an allowed secured claim  but only to the extent  of the then-retail value of the vehicle, to be paid with interest in monthly installments. The balance of the amount due the creditor in connection with the debtor's purchase of the new vehicle would be allowed but only as an unsecured claim.  The creditors filed objections to all of the plans, arguing that the entire balance due to the creditors should have been allowed as a secured, purchase money security interest.

The bankruptcy court ruled in each of these cases that the creditor did not have a purchase money security interest in that portion of the amount financed that was used to pay off the outstanding loan balance on the debtor's trade-in vehicle.  Applying the so-called "transformation rule," through which the presence of both purchase money and non-purchase money obligations in one transaction transforms the entire transaction into a non-purchase money transaction, the court held that the creditors' claims in these cases were not secured by any PMSI, but instead were secured only to the extent of the value of the collateral, *i.e.*, the then-market value of the newly-purchased vehicle.  *In re Peaslee*, 358 B.R. 545, 554-60 (Bankr. W.D.N.Y. 2006).  These appeals followed.

## DISCUSSION

### I. Standard of Review

On appeal from a bankruptcy court, the district court will not set aside the bankruptcy court's findings of fact unless they are clearly erroneous.  Fed. R. Bankr. 8013.  Conclusions of

law are subject to *de novo* review.  *In re AroChem Corp.*, 176 F.3d 610, 620 (2[d] Cir. 1999); *In re*

*Bennett Funding Group, Inc.*, 146 F.3d 136, 138 (2[d] Cir. 1998).  In the cases at bar, the relevant

facts are not in dispute, and the only issues before me are issues of law.  *De novo* review is

therefore the appropriate standard here.


**II. Statutory Framework**

Under § 506(a) of the Bankruptcy Code, a secured claim may be bifurcated into secured

and unsecured components.[2]  Prior to the adoption of BAPCPA in October 2005, a Chapter 13

debtor could bifurcate a motor vehicle loan under § 506(a), treating the obligation as secured up

to the value of the vehicle, with the remainder of the claim listed as an unsecured claim.  Thus,

the debtor could retain the collateral  (the vehicle) over the creditor's objection, as long as the

---

[2]Section 506(a) provides:

(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim.  Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

(2) If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing.  With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

debtor paid the present value of the collateral (the allowed secured claim) over the term of the plan, which could be up to five years.[3]

At the conclusion of the plan, the debtor could retain the vehicle and any unpaid portion of the debt to the creditor would be extinguished pursuant to the provisions of Chapter 13. This procedure routinely utilized by bankruptcy courts is often characterized as the stripping down of the creditor's claims or, perhaps more pejoratively as a "cramdown." "This procedure is known as a 'cramdown'–the court crams down the creditor's throat the substitution of money for the collateral, a situation that creditors usually oppose because the court may underestimate the collateral's market value and the appropriate interest rate, and the debtor may fail to make all promised payments, so that the payment stream falls short of the collateral's full value." *In re Wright*, ___ F.3d ___, 2007 WL 1892502, at *1 (7th Cir. 2007).

BAPCPA, however, altered the landscape in this area in a substantial way. A new provision was added to the Bankruptcy Code which provided significant protection for those who finance automobile transactions that occur within a relatively brief period prior to the debtors' filing for Chapter 13 protection.

BAPCPA added to 11 U.S.C. § 1325(a) what has become commonly known as the "hanging paragraph" (because it follows the numbered subsections, but has no numerical designation of its own), which makes § 506 inapplicable to certain claims. If the provisions of this "hanging paragraph" are met, the bankruptcy court is precluded from reducing or stripping-

---

[3] Alternatively,  the debtor could surrender the vehicle to the secured creditor, who would then liquidate the vehicle under state law and file an unsecured claim for any deficiency. *In re Belcher*, ___ B.R. ___, 2007 WL 1639342, at *3 (Bankr. E.D.Ark. 2007).

down the creditor's *purchase money security interest* on the debt and the entire amount of that

indebtedness must be covered in the plan.

Specifically, the hanging paragraph provides that

[f]or purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

In order to avoid cramdown, then, four conditions must be satisfied:  (1) the creditor has a PMSI;

(2) the debt was incurred within 910 days preceding the filing of the petition; (3) the collateral

for the debt is a motor vehicle; and (4) the motor vehicle was acquired for the personal use of the

debtor.[4]  If those conditions are met, "then the creditor's claim is deemed fully secured[,] ... not

---

[4]Subsection (5) provides that the bankruptcy court shall confirm a plan if, *inter alia*,

with respect to each allowed secured claim provided for by the plan–
(A) the holder of such claim has accepted the plan;
(B)(i) the plan provides that–
(I) the holder of such claim retain the lien securing such claim until the earlier of–
(aa) the payment of the underlying debt determined under nonbankruptcy law; or
(bb) discharge under section 1328; and
(II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law;
(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and
(iii) if–
(I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and
(II) the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan; or
(C) the debtor surrenders the property securing such claim to such holder;

because the value of the vehicle is equal to the amount of the claim, as required by 11 U.S.C. § 506, but because the hanging paragraph found in 11 U.S.C. § 1325(a) so designates it by stating that 11 U.S.C. § 506 does not apply ... ." *In re Belcher*, ___ B.R. ___, 2007 WL 1639342, at *3 (Bankr. E.D.Ark. 2007).

### III. Whether Appellees Have a PMSI in the Negative Equity on the Trade-In Vehicles

The bankruptcy court determined that a cramdown of each automobile loan to the value of the secured vehicle was appropriate under § 506 of the Code because a portion of the claim did not constitute a purchase money security interest. Therefore, it was not exempt from a cramdown under the recently-enacted hanging paragraph in § 1325.

In the cases on appeal, there is no dispute that three of the four conditions in § 1325 for avoiding cramdown have been met: each of the debtors incurred debt by purchasing a motor vehicle for the debtor's personal use within 910 days prior to filing the bankruptcy petition. The issue before me is whether each of the creditor-appellants has a PMSI securing the debt in question.

Because the Bankruptcy Code does not define the term "purchase money security interest," courts have looked to state law to make that determination. *See, e.g.*, *Citifinancial Auto v. Hernandez-Simpson*, ___ B.R. ___, 2007 WL 1464258, at *7 (D.Kan. 2007) ("Whether a creditor has a PMSI securing a debt is a matter of state law"); *accord In re Acaya*, ___ B.R. ___, 2007 WL 1492475, at *2 (Bankr. N.D.Cal. 2007); *In re Stevens*, ___ B.R. ___, 2007 WL 1175487, at *2 (Bankr. D.Neb. 2007); *In re Westfall*, ___ B.R. ___, 2007 WL 981730, at *4 (Bankr. N.D.Ohio 2007); *In re Price*, 363 B.R. 734, 740 (Bankr. E.D.N.C. 2007). In particular, courts,

including the bankruptcy court in the cases at bar, considered § 9-103 of the Uniform

Commercial Code, which provides at subsection (b)(1) that a "security interest in goods is a

purchase-money security interest ... to the extent that the goods are purchase-money collateral

with respect to that security interest ... ."  "Purchase-money collateral" in turn is defined as

"goods or software that secures a purchase-money obligation incurred with respect to that

collateral," N.Y. U.C.C. § 9-103(a)(1), and "purchase-money obligation" is defined as "an

obligation of an obligor incurred as all or part of the price of the collateral or for value given to

enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used."

*Id.* § 9-103(a)(2).  *See, e.g., Citifinancial Auto*, 2007 WL 1464258, at *8; *In re Petrocci*, ___

B.R. ___, 2007 WL 1813217, at *4-5 (Bankr. N.D.N.Y. 2007); *Peaslee*, 358 B.R. at 556-58.

Whether a PMSI exists in the cases at bar, then, turns on whether the negative equity on

the debtors' trade-ins constitutes "part of the price of the collateral," *i.e.*, part of the price of the

"new" vehicles, or, in the alternative, whether it constitutes "value given to enable the debtor[s]

to acquire rights in or the use of the collateral ... ."

Both appellants and the Trustee agree that the definition of "purchase money security

interest" set forth in § 9-103 should control here.  *See* Trustee's Brief (Dkt. #9) at 7 ("The

applicable New York law is N.Y. U.C.C. § 9-103"); Appellants' Brief (Dkt. #13) at 19 ("courts

have appropriately looked to Revised Article 9 of the UCC ... for guidance in interpreting the

meaning of [the hanging paragraph]").  They differ, however, as to whether the negative equity,

rolled into the  indebtedness is covered by this provision.  The Trustee contends that negative

equity on the trade-ins is neither part of the "price" of the collateral nor "value given" to enable

the acquisition of rights in the collateral.  Appellants argue that the negative equity falls into both

categories.

Comment 3 to § 9-103 is helpful since it seeks to define some of the terms in § 9-103.

This provision of the UCC and Comment 3 are often discussed by courts in an effort to

determine the issue presented here.

Comment 3 to § 9-103 states that "the 'price' of collateral or the 'value given to enable'

includes obligations for expenses incurred in connection with acquiring rights in the collateral,

sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit,

demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and

other similar obligations."  In the cases at bar, the bankruptcy court held that the roll-in of

negative equity on a trade-in vehicle is not "similar" to the other items listed in Comment 3

because it "is not the kind of incidental and directly related expense, such as taxes and license

and registration fees, contemplated by Comment 3 ... ."  *Peaslee*, 358 B.R. at 557.  The Trustee

likewise contends that the "similar obligations" contemplated by Comment 3 should be limited to

charges "that are always a part of an automobile sale."  Trustee's Brief at 11.

There are several difficulties with this argument.  First, in addition to the specific items

listed in Comment 3, the comment also includes "obligations for expenses incurred in connection

with acquiring rights in the collateral."  Since the items following that term–sales taxes, duties,

etc.–are not set off by the words "such as," "including," or a similar phrase, they are apparently

not listed as *examples* of such expenses, but as *additional* components of the "price" of the

collateral, or of "value given" by the debtor.  It is not apparent why a refinancing of rolled-in

negative equity on a trade-in as part of a motor vehicle sale could not constitute an "expense[]

incurred in connection with acquiring rights in" the new vehicle.  If the buyer and seller agree to include the payoff of the outstanding balance on the trade-in as an integral part of their transaction for the sale of the new vehicle, it is in fact difficult to see how that could *not* be viewed as such an expense.

Second, the Trustee offers no support for the assertion that the specific items listed in Comment 3–"sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, [and] attorney's fees"–are "always part of an automobile sale."  While some of those items, such as sales taxes, might be, it is far from clear that others, such as storage fees, demurrage, collection expenses and attorney's fees, are "always," or even customarily, part of a vehicle sale.

In addition, Comment 3 states that "[t]he concept of 'purchase-money security interest' requires a close nexus between the acquisition of collateral and the secured obligation.  Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price."  Where the parties to the transaction agree to a "package transaction" in which "[t]he negative equity is inextricably intertwined with the sales transaction and the financing of the purchase," *Graupner v. Nuvell Credit Corp.*, No. 4:07-CV-37, 2007 WL 1858291, at *2 (M.D.Ga. 2007), one could certainly conclude that "[t]his close nexus between the negative equity and this package transaction supports the conclusion that the negative equity must be considered as part of the price of the collateral."  *Id.* (observing that "[t]he trade-in of the vehicle was an integral part of the sales transaction"); *see also In re Cohrs*, ___ B.R. ___, 2007 WL 2186135, at *2 (Bankr. E.D.Cal.) ("When a car buyer offers to trade in a vehicle as part of the

purchase price for another vehicle, the charges incidental to transferring the trade-in vehicle are part of the purchase price of the new vehicle," and that "[t]hose charges are incurred to 'enable the debtor to acquire rights in' the new vehicle"); *Petrocci*, 2007 WL 1813217, at *9 (stating that "[t]his negative equity financing is inextricably linked to the financing of the new car" since "[i]t is clear that one would not take place without the other"). The fact that negative equity and trade-ins do not *have* to be included in a sale, and that the buyer could, in theory at least, pay off the negative equity by other means, does not require a contrary result, if the facts surrounding the particular transaction at issue are such that the negative equity was integral to the sale. *See* N.Y. U.C.C. § 1-201(37)(a) ("Whether a transaction creates a ... security interest is determined by the facts of each case").

It is quite common in the automobile industry to roll in the balance due on a trade-in vehicle as part of the amount financed on the new vehicle. This common practice clearly facilitates such commerce. This industry practice is not an insignificant consideration. The UCC, at § 1-102, clearly states that its provisions should be "liberally construed and applied to promote its underlying policies," which include "the continued expansion of commercial practices through custom, usage and agreement of the parties ... ."

There is additional statutory support to conclude that the unpaid balance on a trade-in vehicle can and should be considered part of a purchase price on the new vehicle and, therefore, entitled to a purchase money security interest.

This conclusion finds support in New York's Motor Vehicle Retail Installment Sales Act ("MVRISA"), contained in Article 9 of the Personal Property Law. MVRISA defines "cash sale price" as

the cash sale price stated in a retail installment contract for which the seller would sell to the buyer, and the buyer would buy from the seller, the motor vehicle which is the subject matter of the retail installment contract if the sale were a sale for cash instead of a retail installment sale.  The cash sale price may include any taxes, registration, license and other fees and charges for insurance, for accessories and their installation and for delivering, servicing, repairing or improving the motor vehicle and for other services incidental to the agreement.  *It also may include the unpaid balance of any amount financed under an outstanding motor vehicle loan agreement or motor vehicle retail installment contract or the unpaid portion of the early termination obligation under an outstanding motor vehicle retail lease agreement.*

MVRISA § 301(6) (emphasis added).

The Trustee concedes that the term "cash sale price" in MVRISA "does include antecedent debt or negative equity."  Trustee's Brief at 13.  The Trustee argues, however, that MVRISA is nothing more than a consumer protection statute intended to ensure that car buyers are made aware that negative equity from a prior auto loan is being included in the amount that they must pay under the new sales contract, and that it has little or nothing to do with whether negative equity on a trade-in gives rise to a PMSI.  Appellants, on the other hand, contend that "MVRISA is the principal New York State regulatory statute governing motor vehicle retail installment sales" and that it should be read *in pari materia* with § 9-103 of the U.C.C. Appellants' Brief at 24-30.

The general rule in New York is that "different acts which are in pari materia are to be construed each in the light of the other."  *Meegan v. Progressive Ins. Co.*, ___ A.D.2d ___, 2007 WL 1651872, at *5 (4th Dep't 2007) (quoting *Matter of Cook v. Carmen S. Pariso, Inc.*, 287 A.D.2d 208, 215 (4th Dep't 2001)).  Thus, "statutes in pari materia are to be construed together and 'as intended to fit into existing laws on the same subject unless a different purpose is clearly shown."  *Lower Manhattan Loft Tenants v. Loft Bd.*, 66 N.Y.2d 298, 304 (1985).  *See also Plato's Cave Corp. v. State Liquor Authority*, 68 N.Y.2d 791, 793 (1986) ("It has ... long been

- 13 -

held that statutes which relate to the same or to cognate subjects are in pari materia and to be

construed together unless a contrary intent is clearly expressed by the Legislature").

In my view, the Trustee's position takes too narrow an approach to the *in pari materia*

doctrine.  Application of the doctrine does not require the two statutes to have been enacted for

the same *purpose*, but only that they "relate to the same or to cognate subjects."  Clearly, both

U.C.C. § 9-103 and MVRISA § 301(6) relate to the "price" of a vehicle in a retail installment

contract.

Furthermore, MVRISA as a whole is not concerned simply with financial disclosure to

the consumer.  Significantly, that act also prohibits "the creation of a security interest in any

personal or real property, other than the motor vehicle which is the subject matter of the retail

instalment sale (or accessories therefor or special or auxiliary equipment used in connection

therewith) ... ."  N.Y. Pers. Prop. L. § 314.  "UCC § 9-103 and any statute so directly governing

the formation of security interests in personal and real property as MVRISA does can surely be

deemed to have met the New York Court of Appeals' definition of 'statutes which relate to the

same or to cognate subjects [and] are *in pari materia* and to be construed together ... .'"

*Petrocci*, 2007 WL 1813217, at *10 (quoting *Plato's Cave*, 68 N.Y.2d at 793).  *See also*

*Graupner*, 2007 WL 1858291, at *2 (court's conclusion that "negative equity must be considered

as part of the price of the collateral" was supported by Georgia's analog to MVRISA, which

provided that "cash sales price" includes negative equity); *cf. In re Pajot*, No. 06-31446, 2007

WL 2109892, at *7 (E.D.Va. July 17, 2007) (noting that "[t]he Virginia Code has nothing similar

to" the Georgia statute relied on in *Graupner*, and stating that "[t]his court does not find the

requisite parallels between the Virginia U.C.C. and its retail installment sales statute" to apply *in*

- 14 -

*pari materia* doctrine).  I therefore conclude that the term "price," as used in U.C.C. § 9-103, should be given the same meaning as MVRISA's definition of "cash sales price," which includes negative equity.

To the extent that it is possible to glean any Congressional intent behind the hanging paragraph, *see In re Quick*, ___ B.R. ___, 2007 WL 1941749, at *2 (10th Cir. BAP 2007) (noting "the sparse legislative history of the amendment of § 1325"); *Horr v. Jake Sweeney Smartmart, Inc.*, No. 1:07-CV-00010, 2007 WL 1989611, at *4 (S.D.Ohio July 6, 2007) ("there is very little evidence to reflect what Congress intended by the language it chose to enact in the hanging paragraph"), the result here is also consonant with that intent, which seems to be to protect creditors from the abuse of "cramdown."  *See Pajot*, 2007 WL 2109892, at *15 ("In enacting the hanging paragraph, Congress [sought] to ensure that debtors could not load up on vehicle-secured debt pre-petition only to cram it down to the collateral value in bankruptcy"); *In re Morales*, 359 B.R. 211, 214 (Bankr. N.D.Ill. 2007) ("Congress viewed debtors' ability to bifurcate a creditor's claim as abusive"); *In re Payne*, 347 B.R. 278, 281 (Bankr. S.D.Ohio 2006) ("Congress was attempting to remedy a perceived abuse by those who buy vehicles on credit on the eve of bankruptcy and then utilize the cramdown provisions of the Bankruptcy Code to pay the secured creditor a lesser amount than its full claim"); *In re Sparks*, 346 B.R. 767, 770 (Bankr. S.D.Ohio 2006) (stating that the legislative history "show[s] an intent by Congress to address a perceived abuse of debtors purchasing a vehicle shortly before filing bankruptcy and then cramming down the amount owed to the creditors").

The  "hanging paragraph" itself and the above referenced cases clearly indicate the intent was to protect creditors from perceived abuses created by spendthrift debtors prior to petitioning

for Chapter 13 relief.  To be sure, there are other provisions in BAPCPA that streamlined the

bankruptcy process and, in some cases, protected debtors but the particular provision at issue

here, the so-called "hanging paragraph" of § 1325, was obviously intended to protect the interests

of automobile dealers who provide financing for customers.

By its terms, the hanging paragraph prohibits the bifurcation of *any* claim if the debt is

secured by a PMSI.  To adopt the Trustee's position would in effect undo this amendment, and

put creditors into the same position they were in prior to the enactment of BAPCPA.

Another aspect of this is to give effect to the stated intent of the parties to the challenged

transaction.  As noted earlier, one of the underlying policies of the UCC is to promote "the

continued expansion of commercial practices through ... agreement of the parties ... ."  U.C.C.

§ 1-102(2).  In addition, in the first decision by a Court of Appeals addressing the effect of the

hanging paragraph, the Seventh Circuit recently held that "by knocking out § 506, the hanging

paragraph leaves the parties to their contractual entitlements."  *In re Wright*, 2007 WL 1892502,

at *3 (Easterbrook, J.).  Although *Wright* was concerned with whether debtors could surrender

their car (which was worth less than the outstanding balance on the car loan) to the creditor and

pay nothing on account of the difference between the loan balance and the car's market value,

and did not address the precise issue in the cases at bar, the decision in *Wright* is still noteworthy

for its emphasis on the terms of the parties' contract.  *See id.* (stating that "Section 306(b) of the

2005 Act, Pub.L. 109-8, 119 Stat. 23, 80 (Apr. 20, 2005), which enacted the hanging paragraph,

is captioned 'Restoring the Foundation for Secured Credit," which "implies replacing a

contract-defeating provision such as § 506 ... with the agreement freely negotiated between

debtor and creditor").

I conclude, therefore, that appellants' entire claims, including that portion of the claims attributable to the payoff of negative equity on the debtors' trade-in vehicles, should be treated as secured claims.[5]

## CONCLUSION

The Decisions and Orders of the Bankruptcy Court for the Western District of New York, in *In re Peaslee*, 07-CV-6037 (entered on December 22, 2006), *In re Peaslee*, 07-CV-6121 (entered on January 11, 2007), *In re Jackson*, 07-CV-6072 (entered on January 10, 2007), *In re Martinez*, 07-CV-6202 (entered on March 1, 2007), and *In re Colombai*, 07-CV-6168 (entered on March 1, 2007), are reversed, and these actions are remanded to the bankruptcy court for further proceedings consistent with this Decision and Order.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
        August 15, 2007.

---

[5]My conclusion in this regard renders it unnecessary for the Court to reach the issue of whether the bankruptcy court correctly applied the "transformation rule" rather than the "dual status rule," since that issue arises only in the context of a "mixed" transaction containing both purchase money and non-purchase money components. *See Petrocci*, 2007 WL 1813217, at *13 (stating that since court found that transactions were not mixed, but were entirely purchase money obligations, "the issue of whether or not to apply the Dual Status or Transformation rule does not arise, and need not be addressed." Likewise, I need not address the other particular arguments advanced by appellants in *Colombai* and *Jackson*, which are based on the facts peculiar to those cases.